UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) |  |
| v. | ) ) | NO. 10-CR-10408-WGY |
| **ANGEL QUINONES** | ) ) |  |

## DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. §3582(c)(1)(A)

Now comes the Defendant, Angel Quinones, by and through his counsel, and respectfully moves this Court for an order reducing his sentence pursuant to 8 U.S.C. § 3582(c)(1)(A)(i)

Mr. Quinones specifically requests that his sentence be reduced by 6 months, to end in February 2021. His circumstances are exceptional because, despite having been sentenced to serve his time at the Bureau of Prisons, where he would be eligible for release to a halfway house with 6 months remaining on his sentence, it appears that Mr. Quinones will never reach a Bureau of Prisons facility and will instead serve his entire federal sentence at the Wyatt Detention Center.  The existence of the COVID-19 pandemic has effectively slowed down movement of prisoners through the normal channels of the Bureau of Prisons. This is an understandable reaction to a global pandemic. However it has left many people, like Mr. Quinones, effectively "stuck" and unable to proceed to a BOP facility. Without access to a BOP facility and the attendant case managers, he cannot be approved for or placed in to a halfway house. This essentially adds 6 months on to Mr. Quinones sentence.

1

## PROCEDURAL BACKGROUND

Mr. Quinones is presently serving a 15 month revocation judgment imposed by this Court on October 22, 2019. The 15 month sentence was deemed to run consecutive to the state prison sentence he was then serving. Mr. Quinones finished his state prison sentence in approximately late July/early August of 2020. He was transferred from the Department of Correction to the Wyatt Detention Center. With the calculation of good time, we anticipate his release date to be August 31, 2021. For inmates with clean disciplinary records, the Bureau of Prisons has the ability to release them early to either home confinement or a halfway house, when they have 6 months to 1 year remaining on their sentence, with 6 months being customary. Mr. Quinones will reach the 6 month mark in February of 2021.

## ARGUMENT

1. As Amended by the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A) now Authorizes Courts to Reduce Sentences for "Extraordinary and Compelling Reasons" on Motion of the Defendant, and Without a BOP Recommendation.

Recent changes to the statutory language of 18 U.S.C. § 3582 provide new jurisdiction to federal courts to grant release for extraordinary and compelling reasons. A court may now reduce a prisoner's sentence "if it finds that — (1) extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

Prior to 2018, only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate release" [1] motions. *United States v. Brown*, 457 F. Supp. 3d 691, 696 (S.D. Iowa 2020).[2] The BOP rarely did so. Although the BOP was first authorized to file compassionate-release motions in 1984, from 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *See* Hearing on Compassionate Release and the Conditions of Supervision before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).[3] According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id*. The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id*.

Against this backdrop, Congress passed and President Trump signed the First Step

---

[1] The Comprehensive Crime Control Act of 1984 first included the so-called "compassionate release statute" which allowed for a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons ("BOP"). 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473, 98 Stat 1837 (Oct. 12, 1984). Without such motion, district courts were unable to reduce a prisoner's sentence, even if it concluded that extraordinary and compelling reasons existed to do so. The BOP served as a gatekeeper to a prisoner's road to potential relief and limited the sentencing court's jurisdiction.

[2] *United States v. Brown* is currently on appeal in the 8th Circuit, No. 20-2053.

[3] Available at https://oig.justice.gov/node/798.

Act in 2018, a landmark piece of criminal-justice reform legislation that "amended numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 457 F.Supp.3d at 696 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.[4]

The amendment to § 3582(c)(1)(A) provided prisoners with two routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). These changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." *United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice. 28 U.S.C. § 994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id*. The Commission

---

[4] *See also United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

did so prior to the passage of the First Step Act, but has not since updated the policy statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (1)(A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

This catchall provision implicitly recognizes that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes and renders subsections (A)-(C) non-exclusive. *See United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 does not "suggest that the list [of criteria] is exclusive"); *United States v. Beck*, 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes

imposed by the First Step Act,[5] and the policy statement is now clearly outdated. The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP. An Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . "); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also Brown*, 457 F. Supp. 3d at 699 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, many district courts, including district courts within the First Circuit, have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)." *Beck*, 425 F. Supp. 3d at 579; *see also United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role. …I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); *United States v. Bucci,* 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (following *Fox* and holding that "the Commission's existing policy statement provides helpful guidance on the factors

---

[5] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action. *See, e.g., United States v. Maumau*, No. 2:08-cr-00785-TC-11, 2020 WL 806121, at *1 n.3 (D. Utah Feb. 18, 2020); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019).

that support compassionate release, although it is not ultimately conclusive"); *Brown*, 457 F. Supp. 3d at 701 ("[T]he most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *Redd*, 444 F. Supp. 3d at 725 ("Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance. . . . [R]estricting the Court to those reasons set forth in U.S.S.G. §1B1.13 cmt. n.1(A)-(C) . . . would effectively preserve to a large extent the BOP's role as exclusive gatekeeper, which the First Step Act substantially eliminated . . ."); *Young*, 2020 WL 1047815, at *6 ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); *Maumau*, 2020 WL 806121 at *2-*3 (collecting cases).[6]

This Court therefore has discretion to assess whether Mr. Quinones presents "extraordinary and compelling reasons" for his release outside those listed in the non-exclusive criteria of subsections (A)-(C) of the pre-First Step Act policy statement. *See* Memorandum, *United States v. Jeremy Rodriguez*, 03-cr-00271-AB-1, ECF No. 135 (E.D.P.A. Apr. 1, 2020), at 12 (granting compassionate release due to COVID-19 and

---

[6] A smaller number of courts have concluded that the Sentencing Commission's policy statement prevents district courts from considering any "extraordinary and compelling reasons" outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g., United States v. Lynn*, No. 89-0072-WS, 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields,* No. 12-cr-00410-BLF-1, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019).

holding that the Court had discretion to assess whether the defendant presented "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the policy statement and citing *Fox*, 2019 WL 3046086, at *3 for the proposition that "the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive . . . ").

Recently the 2nd Circuit, in United States v. Brooker No. 1903218, WL 5739712 (2d Cir. Sept. 25, 2020) held that the trial court has discretion to consider the possible relevance of any number of factors when deciding to exercise its discretion under the First Step Act.. We ask this Court to exercise its discretion here and essentially give Mr. Quinones the type of sentence he would have been entitled to if the COVID-19 pandemic did not occur – a sentence where he would have the possibility of release to a halfway house or home confinement when he has served all but the last 6 months of his sentence.

2. Administrative Remedy

Mr. Quinones is not designated to a Bureau of Prisons facility and has not requested compassionate release. Accordingly, exhaustion is not an issue in the instant motion for compassionate release. Undersigned Counsel contacted legal counsel for the Bureau of Prisons, which is attached. [7]

3. COVID-19's Rapid Spread Is an Unprecedented Public Health Crisis.

The Centers for Disease Control and Prevention ("CDC") advises that the virus

---

[7] Email from BOP Legal Counsel Darrin Howard, October 26, 2020

8

passes through respiratory droplets when a person coughs, sneezes, or talks.[8] Droplets can land on another person's mouth or nose if they are in close contact (within about 6 feet).[9] It is also possible to catch the virus by touching a surface that has the virus on it and then touching one's mouth, nose, or eyes.[10] The available evidence indicates that the virus may remain on surfaces for up to three days.[11]

Infection can result in severe illness, hospitalization, and in many cases, death.[12] Fatality rates are highest among those over age 65 and those with recognized comorbities. From the start of the COVID-19 pandemic, the CDC has urged communities to "flatten the curve" so that hospitals would not be overwhelmed.[13] To combat transmission, heath experts have recommended "social distancing" – every person should remain at a distance of at least 6 feet from every other person.[14] Leaders across the globe have

---

[8] *See* CDC, "How COVID-19 Spreads" (last accessed October 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[9] *Id.*

[10] *Id.*

[11] *See* Neeljte van Doremalen, et. al., "Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1," New England Journal of Medicine (Mar. 17, 2020), https://www.nejm.org/doi/10.1056/NEJMc2004973 ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces…").

[12] CDC, "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020," https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm#T1_down.

[13] NY Times, "Flattening the Coronavirus Curve" (Mar. 27, 2020), https://www.nytimes.com/article/flatten-curve-coronavirus.html.

[14] Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed May 26, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

mobilized to limit physical interaction and the spread of the virus. In Massachusetts, Governor Charlie Baker enacted emergency orders[15] to close all schools, prohibit on-site consumption of food and beverages, and restrict visitor access to nursing homes. Gatherings of 10 people or more were prohibited. On March 23, 2020, Governor Baker ordered all non-essential businesses to close and directed the Department of Public Health to issue a stay-at-home advisory. That advisory was extended through May 18, 2020.[16] A mask or face covering became mandatory for any person over the age of two in an indoor or outdoor public space when that person was "unable to or [did] not maintain a distance of approximately six feet from every other person."[17] All of these precautionary measures were designed specifically to keep people out of crowded places and to require social distancing to lessen the spread of the virus because it is so highly contagious.

While Massachusetts has seen a recent positive trend in the COVID-19 positive test rate,[18] the majority of states in the country have seen a sharp rise in COVID-19 cases and the country as a whole now has averaged more than 50,000 cases a day. Sadly, the pandemic is not over, and, in fact, in the United States is in the same place, if not worse, than it was in March 2020.

---

[15] Office of Governor Charlie Baker, "COVID-19 State of Emergency" (last accessed October 15, 2020), https://www.mass.gov/info-details/covid-19-state-of-emergency.

[16] Office of Governor Charlie Baker, *COVID-19 Order No. 30*, "Order Further Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More than 10 People" (April 28, 2020), https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download.

[17] Office of Governor Charlie Baker, *COVID-19 Order No. 31*, "Order Requiring Face Coverings in Public Places Where Social Distancing is Not Possible" (May 1, 2020), https://www.mass.gov/doc/may-1-2020-masks-and-face-coverings.

[18] Massachusetts Department of Health, "COVID-19 Dashboard" (July 1, 2020).

>    *a. Jails and Prisons Are "Hot Spots" of COVID-19.*

The COVID-19 pandemic is wreaking havoc in jails and prisons across the country. Carceral facilities represent some of the highest concentrations of COVID-19 in the country.[19] The reason is readily apparent. Like meatpacking plants, cruise ships, and nursing homes, correctional institutions house large populations in close quarters and shared spaces. People within those spaces simply cannot physically distance from one another to prevent the spread of the virus. The New England Journal of Medicine recognized the importance of taking every available precaution with respect to prison populations, including releasing inmates, noting that:

> "interventions will help to flatten the curve of Covid-19 cases among incarcerated populations and limit the impact of transmission both inside correctional facilities and in the community after incarcerated people are released. Such measures will also reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which such patients will be sent. **Each person needlessly infected in a correctional setting who develops severe illness will be one too many**."[20]

Public health experts have warned that infection is particularly challenging in jails and prisons, where incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep

---

[19] NY Times, "Coronavirus in the U.S.: Latest Map and Case Count" (last accessed October 15, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters.

[20] Matthew J. Akiyama, et. al., "Flattening the Curve for Incarcerated Populations – COVID-19 in Jails and Prisons," New England Journal of Medicine (April 2, 2020) (available at https://www.nejm.org/doi/full/10.1056/NEJMp2005687) (emphasis added).

themselves safe."[21]

According to a CDC study on COVID-19 in correctional and detention facilities, these institutions face specific challenges in combating the virus, including: "crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, and transport of incarcerated or detained persons in multiperson vehicles for court-related, medical, or security reasons."[22]

Two jails in Ohio provide a cautionary tale. As of May 20, 2020, Marion Correctional Institution reported 2,142 inmate COVID-19 cases, and the Pickaway Correctional Institution reported 1,647 inmate COVID-19 cases.[23] 14 inmates have died at Marion and at least 34 have died at Pickaway; one staff member also has died at each facility.[24] The Ohio corrections department originally planned to move infected inmates from Marion to a separate facility and "decided to test everyone" at the prison, the idea being "to find the people who were positive and asymptomatic and move them[.]" According to the director of the department, "When we got the results back from Marion,

---

[21] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," 4 (March 2, 2020), at https://bit.ly/2W9V6oS.

[22] CDC, "COVID-19 in Correctional and Detention Facilities – United States, February-April 2020" (May 6, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6919e1-H.pdf, at 1.

[23] These numbers include inmates who are "currently positive" for COVID-19, inmates who have recovered from COVID-19, and inmates who have confirmed COVID-19 related deaths. *See* Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (May 20, 2020), https://coronavirus.ohio.gov/static/reports/DRCCOVID-19Information.pdf.

[24] *Id*. (two additional inmate deaths at Pickaway are "probable" COVID-19 related deaths).

there were so many people who were asymptomatic and positive, we knew that everyone who lived in that prison had had exposure and the separation wasn't going to work."[25]

BOP facilities have also seen major COVID-19 outbreaks. Across all BOP facilities, thousands of inmates have tested positive; 126 have died.[26] USP Lewisburg is currently one of the worst facilities within the BOP.

More specifically, there has been a sustained outbreak of COVID-19 at the Wyatt Detention Facility for some time. As of November 16, there were 31 active cases of COVID-19 for detainees and 18 for staff who are out on leave having tested positive. [27]

b. Mr. Quinones' Release Is Consistent With 18 U.S.C. § 3553(a).

When a defendant establishes extraordinary and compelling reasons for a sentence reduction, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Those factors weigh in favor of reducing Mr. Quinones sentence by 6 months.

Additional consideration should be paid to the fact that Mr. Quinones would likely otherwise have been released to a halfway house in of February of 2021, but for the pandemic.

Accordingly, the Court must balance whether an additional 6 months in prison is needed to protect the public in light of the very real and serious risks of COVID-19 at the

---

[25] Marion Star, "Ohio Prison Planned to Isolate Sick Inmates. But Then 80% Tested Positive." (Apr. 30, 2020), https://www.marionstar.com/story/news/local/2020/04/30/marion-ohio-prison-planned-isolate-sick-inmates-80-tested-positive/3059217001/.

[26] BOP, "COVID-19 Cases" (last accessed October 15, 2020), https://www.bop.gov/coronavirus/.

[27] Email update from Wyatt Regarding COVID-19, November 17, 2020

Wyatt Detention Center.

## CONCLUSION

For the foregoing reasons, Mr. Quinones respectfully requests that the Court grant a 6 month reduction in his sentence.

ANGEL QUINONES
By his attorney,

*/s/ Jessica P. Thrall*
Jessica P. Thrall
BBO# 670412
Federal Defender Office
51 Sleeper St., 5th Floor
Boston, MA  02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Jessica P. Thrall, do hereby certify that this document has been filed electronically and that it will be served electronically to registered ECF participants as identified on the Notice of Electronic Filing (NEF) on November 29, 2020

*/s/ Jessica P. Thrall*
Jessica P. Thrall